AO-106 (Rev: 06/09)-Application for Search Warrant

*F I L E D*

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

*SEP 18 2025*
*Heidi D. Campbell, Clerk*
*U.S. DISTRICT COURT*

| | |
|---|---|
| In the Matter of the Search of | ) |
| ***Samsung Galaxy with Sunflower Case, Blue Max West*** | ) |
| ***Nitro N62 Smartphone, Motorola XT2513-2, Blue Moto*** | ) |
| ***G Play. Currently Stored at 129 5th Ave NW, Miami,*** | ) |
| ***Oklahoma 74354*** | ) |

Case No. 25-MJ-788-CDL

**FILED UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the ___Northern___ District of ___Oklahoma___, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| **21 USC 841** | **Unlawful drug possession and drug distribution** |

The application is based on these facts:
**See Affidavit of DEA TFO Cody Norman, attached hereto**.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Cody Norman, DEA TFO
*Printed name and title*

Subscribed and sworn to by phone.

Date: ___September 18, 2025___

_____
*Judge's signature*

City and state: ___Tulsa, Oklahoma___

Christine D. Little, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

In the Matter of the Search of
*Samsung Galaxy with Sunflower Case,*
*Blue Max West Nitro N62 Smartphone,*
*Motorola XT2513-2, Blue Moto G Play.*
*Currently Stored at 129 5th Ave NW,*
*Miami, Oklahoma 74354*

Case No. _____

FILED UNDER SEAL

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Cody Norman, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property— electronic Devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. Since 2022, I have been a DEA TFO. Currently, I am assigned to the Tulsa Resident Office ("TRO") in Tulsa, Oklahoma, and a United States investigative or law enforcement officer as defined in 21 U.S.C. § 878(a). I attended Missouri Southern State University in

Joplin, Missouri, and earned a Bachelor of Science degree in Criminal Justice.
Additionally, I am a Criminal Investigator with the Quapaw Nation Marshal
Service.

3. I have been in law enforcement since 2012, working several assignments
including Patrol, K9, and Investigations. I completed the Basic Police Academy at
the State of Oklahoma Council on Law Enforcement Education and Training
("CLEET") and currently hold an Advanced Law Enforcement Certification issued
by CLEET. I attended and passed the Criminal Investigators Training Programs at
the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.
Annually, I am required to complete at least forty hours of law enforcement
continuing education.

4. Throughout my law enforcement career, I received training in drug
enforcement involving possession, sale, manufacture, and distribution of controlled
substances and narcotics. I am also trained in the identification of illegal drugs,
clandestine laboratory manufacturing, criminal interdiction, interview and
interrogation, physical surveillance, covert electronic surveillance, money laundering
investigations, and various other areas of law enforcement unrelated to narcotics. I
made arrests for the possession, distribution, and trafficking of controlled substances
throughout my career in law enforcement.

5. During my time in law enforcement, I participated in investigations involving
controlled substances, specifically manufacturing, trafficking, distribution,
cultivation, and possession of controlled substances, as well as money laundering

2

linked to the proceeds of controlled substances. I engaged in operations involving the surveillance, detection, identification, and seizure of controlled substances, utilizing confidential sources and undercover agents who acted in an undercover capacity to purchase them. I have also obtained and executed search warrants related to violations of controlled substance laws.

6. My required training included learning methods of unlawfully manufacturing illegal narcotics through Clandestine Laboratories, installing and monitoring global positioning satellite ("GPS") trackers, conducting Title III wire interceptions, and smuggling and distribution techniques. I learned how drug traffickers derive, launder, and conceal profits from drug trafficking, use of assets to facilitate unlawful drug trafficking activities, and laws that allow the forfeiture of assets to the United States that were purchased with drug proceeds or intended for facilitating drug violations. Through my education, training, and experience, I gained significant knowledge about drug trafficking organizations and their members; I know drug traffickers utilize different techniques to remain undetected and will go to great lengths to avoid being caught by law enforcement. I know individuals involved in the distribution of controlled substances sometimes maintain coded records and hide drug proceeds.

7. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information

3

including information available on the internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

8. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii) – Possession with Intent to Distribute Methamphetamine will be located in the electronically stored information described in Attachment B and is recorded on the Devices described in Attachment A.

### Identification of the Devices to be Examined

9. There are four cell phones described below as property to be examined. All four cell phones are contained in Attachment A.

10. The property to be searched includes a Samsung Galaxy phone with a sunflower case, pictured in Attachment A(1).

11. The property to be searched includes a Blue Max West Nitro N62 smartphone, pictured in Attachment A(2).

12. The property to be searched includes a Motorola XT2513-2 cell phone, pictured in Attachment A(3).

13. The property to be searched includes a Blue Moto G Play cell phone, pictured in Attachment A(4).

14. All four of the aforementioned Devices are currently located at 129 5th Ave NW, Miami, Oklahoma.

4

15.  The applied-for warrant would authorize the forensic examination of the aforementioned Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

### Probable Cause

16.  On May 9, 2025, Drug Enforcement Administration (DEA) Task Force Officers (TFO) Cody Norman, Jacob Hamblett, and Sean McDonald interviewed Kimberly Joann Bailey at the Cherokee County Jail following her arrest for drug trafficking.  Bailey was read her *Miranda* rights, acknowledged understanding them, and signed a waiver form agreeing to speak with investigators.

17.  In summary, Bailey indicated in the interview she was a source of supply for methamphetamine in the Ottawa County, Oklahoma area. She stated since December 2024, she received on a weekly to bi-weekly basis, one to two pounds of methamphetamine from a Mexican Drug Trafficking Organization (DTO).

18.  At the interview, Bailey consented to the search of her cellphone and an extraction was performed on the device. During the examination of the device, TFO Norman located text conversations with a contact listed on the device as "Nae Nae." TFO Norman knows from information gathered during the investigation that "Nae Nae" is Natasha Beaty.

19.  Examples of these text messages include on March 27, 2025, Bailey sent a text message to Nae Nae that read "Anything yet" and Nae Nae replied on the same date, "a zip for 2 at one place which i got … but waiting on the other dude to find

5

out." On March 28, 2025, Nae Nae sent a text message that read "O dude just called said he has qp for 7 if you want me to go get it lmk…"

20. Based on affiant's training and experience as a police officer he knows a "zip" is commonly used to describe an ounce of illegal drugs and "qp" means a quarter pound of illegal drugs.

21. On July 3, 2025, license plate recognition (LPR) cameras sent TFO Jacob Hamblett a notification of a grey Buick sport utility vehicle (SUV) owned by Betty McCollem. The LPR notification showed the SUV traveling southbound at the intersection of Highway 69A and 66 Road toward the I-44 access ramp. Shortly after receiving this LPR notification, TFO Hamblett received information from a confidential source that Natasha Beaty was preparing to make a trip to Oklahoma City to purchase methamphetamine to resupply herself, then return to the Miami, Oklahoma area. The confidential source indicated she was driving a gray Buick sport utility vehicle (SUV).

22. Agents with the DEA Tulsa Resident Office began to attempt to locate the SUV traveling on the interstate. Agents located the SUV in the Tulsa area. Agents began conducting surveillance on the SUV from the Tulsa metro area to the Sapulpa, Oklahoma area, where the SUV stopped briefly without contacting anyone. The SUV then continued on I-44 towards Oklahoma City.

23. Agents continued surveilling the SUV as it drove towards Oklahoma City. During the surveillance, Agents observed Beaty exiting the SUV and meeting with a

male. The two were seen going into an apartment and then returning to the SUV. The male was seen carrying what appeared to be plastic bags.

24. The SUV made several stops at gas stations and then began to travel towards the Tulsa area. The SUV then took the Adair, Oklahoma exit, making a brief stop at the Casey's General Store in Adair, before continuing toward Big Cabin, Oklahoma.

25. Oklahoma Highway Patrol Trooper Seth Hudson was working traffic near Big Cabin, Oklahoma, which is located within the Northern District of Oklahoma, when he noticed the SUV following too closely for a legally posted 45 mile per hour zone. Trooper Hudson conducted a traffic stop on the SUV in the parking lot of The Woodshed of Big Cabin gas station in Big Cabin, Oklahoma, which is located within the Northern District of Oklahoma.

26. According to Trooper Hudson's report, after he stopped the SUV, Lt. Caleb Cole with the Oklahoma Highway Patrol deployed his certified drug detection police K-9, Eis, for an external screen of the SUV. Eis gave a positive alert indication to the presence of illegal narcotics inside the SUV. During the search of the SUV, troopers located budded marijuana and small crystal shards. Lt. Cole recognized the crystal shards to be methamphetamine. Glass methamphetamine smoking devices were also located inside the SUV.

27. Natasha Beaty was the driver of the SUV. Jeremiah Kruschick and Betty McCollum were passengers inside the SUV. Beaty, Kruschick, and McCollum were arrested on state drug charges. At the Craig County Jail, jail staff searched Beaty. Jail staff located two narcotics smoking devices, two baggies of what appeared to be

7

methamphetamine, weighing about one-ounce, suspected heroin, multiple plastic baggies, and a small baggie of suspected marijuana on Beaty's person.

28. Beaty's cellphone, a **Samsung Galaxy phone with sunflower case, identified in Attachment A(1),** was located during the search and turned over to DEA Task Force Officers and is one of the cellphones subject to this warrant.

29. Task Force Officers Hamblett, Norman, and Sean McDonald interviewed Jeremiah Kruschick after he was arrested by Trooper Hudson. Kruschick waived his *Miranda* rights and spoke with investigators without an attorney present.

8

30. Kruschick stated several people came to the apartment where he was staying to buy methamphetamine. He identified Beaty and Betty McCollum as individuals who purchased methamphetamine from him. Kruschick stated he acted as a middleman for them. Kruschick stated Beaty bought approximately an ounce and a half of methamphetamine on this trip directly from the drug source of supply and he did not participate in the transaction.

31. Kruschick stated McCollum and Beaty asked him to come up with a quarter pound of methamphetamine but they didn't come-up with enough money to buy it from him. Kruschik did not consent to a search of his cell phone which he identified as being the **Blue Moto G Play cell phone, pictured in Attachment A(4)**.

32. During a post *Miranda* interview with McCollum, she admitted to having drug-related messages on her phone and stated she makes small deals to make ends meet. She said she has two phones, one a Wi-Fi phone, and one a government phone, both of which are subjects of this warrant. McCullum gave verbal consent to search her devices during the interview. She identified her phones as a **blue Maxwest Nitro N62 smartphone, pictured in Attachment A(2),** and a **Motorola XT2513-2 cell phone, pictured in Attachment A(3)**. TFO Hamblett reviewed one of her phones in her presence. While examining one of her cell phones, TFO Hamblett observed messages between McCullum and someone she identified as Kruschik.

9

McCullum and Kruschik discussed Kruschik obtaining a quarter pound of
methamphetamine to purchase.

33. The Devices are currently in storage at 129 5th Ave NW, Miami, Oklahoma.
In my training and experience, I know the Devices have been stored in a way its
contents are in substantially the same state as they were when the Devices first came
into the possession of law enforcement investigators.

**Technical Terms**

34. Based on my training and experience, I use the following technical terms to
convey the following meanings:

a.      Wireless telephone: A wireless telephone (or mobile telephone, or
cellular telephone) is a handheld wireless device used for voice and data
communication through radio signals. These telephones send signals through
networks of transmitter/receivers, enabling communication with other
wireless telephones or traditional "land line" telephones. A wireless telephone
usually contains a "call log," which records the telephone number, date, and
time of calls made to and from the phone. In addition to enabling voice
communications, wireless telephones offer a broad range of capabilities. These
capabilities include: storing names and phone numbers in electronic "address
books;" sending, receiving, and storing text messages and e-mail; taking,
sending, receiving, and storing still photographs and moving video; storing
and playing back audio files; storing dates, appointments, and other
information on personal calendars; and accessing and downloading

10

information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the devices.

b.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

11

d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can

12

store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the devices.

f.      Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

g.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and

13

international borders, even when the devices communicating with each other are in the same state.

35. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://www.samsung.com, I know that the devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation Devices, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

### Electronic Storage and Forensic Analysis

36. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the devices. This information can sometimes be recovered with forensics tools.

37. I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities to include evidence of illegal drug trafficking. These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media devices to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages, emails are often used by two or

14

more persons to communicate information regarding illegal activities, between
principals and co-conspirators of those crimes.

38. I know that cellular telephones are utilized by the majority of individuals in
the United States and have become a staple of communication between individuals
using text messaging, visual and audible communications (telephone calls and
FaceTime type communications) as well as applications like "Whatsapp" and
"GroupMe." Additionally, individuals utilize their cellular devices to take pictures,
keep notes, as a GPS (global positioning System) device, and even to conduct illicit
or illegal activity. Communications on phones are kept for long periods and
transferred from one phone to another when replaced. This is done through the use
of Cloud storage and direct transfer conducted at the time of purchase or by the
individual themselves. Individuals utilize this method as not to lose data that is
stored on the phone such as contacts, photos, notes, and other important information
to the individual. This data includes contacts used to conduct illegal activities to
include drug trafficking.

39. Based on my education, training, and experience, I know that individuals
involved in the use, sales, manufacturing, and transportation of illegal narcotics often
use cell phones and other electronic devices to further their trade by conducting
business on them via text messages and phone calls. I also know from my training,
education, and experience that:

  a. Drug distributors/traffickers commonly maintain books, records, receipts,
     notes, ledgers, and other documents/papers both electronically and in

15

paper form, which relate to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code and/or identify customers/sources/co-conspirators through monikers/nicknames. Documentation such as this oftentimes results because drug distributors/traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients and must account for these transactions in order to collect outstanding drug debts.

b. Drug distributors/traffickers commonly maintain addresses or telephone numbers in notebooks, papers, cellular phones, computers and electronic storage media which reflect names, address, and/or telephone numbers for their associates in the drug distribution/trafficking organization, even if said items may be in code, and such traffickers send and receive items listed in this affidavit by mail and other common carriers.

c. Drug users, distributors and traffickers frequently take, or cause to be taken photographs or videotapes of themselves, their associates, their property/assets, and their product, and these individuals usually maintain these photographs or recordings/videos in the residences under their control. These photographs and videos are also often found in the individual's cellular telephone, computers and other electronic storage media.

d. Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the

16

commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information. This information may be contained on the cellular telephone.

e. Text messages and e-mails are often used by two or more persons to communicate information regarding illegal activities between two telephones or between one telephone and a personal computer. This information can include directions for deliveries, stash locations, prices, cell phone contact numbers, and instructions.

f. Cellular telephones often contain stored phone numbers and contact information of individuals that conduct business with other co-conspirators that possess the cellular telephone.

g. When drug users/dealers/traffickers use text messages to discuss topics such as quantities, prices, and the quality of controlled dangerous substances, as well as dates, times and locations for drug transactions, these communications are often in coded drug talk/jargon and require review by peace officers experienced in deciphering such communications.

h. In my experience in searching cellular telephones possessed by known drug users/distributors/traffickers, photos and/or videos have been discovered which evidence the use and distribution of controlled dangerous substances

17

and the proceeds intended for or derived therefrom. This evidence often depicts pictures/videos of drugs for showing drug quality, condition or quantity. Moreover, users will commonly document episodes of drug use in social settings. Additionally, drug distributors will take pictures ("trophy" pictures) or otherwise capture digital recordings for the purpose of memorializing their credibility/capability as a drug dealer and accomplishments (acquisition of assets/large amounts of U.S. currency) relating thereto.

i.   In all phases of drug distribution, the utilization of cellular telephones is essential. Drug users/dealers/traffickers use cellular telephones to place calls, as well as communicate by SMS text messaging. As drug dealing necessarily entails constant communications with accomplices, co-conspirators, clients, and sources, these communications virtually always take place by voice calls and text messaging over cellular telephones.

j.   Cellular telephones are almost always used by drug distributors as a way to communicate. They will communicate by verbal conversations, digital text messaging, and/or sending photographs to one another. To avoid detection, drug distributors will oftentimes speak in coded language or through use of vague messages. Sometimes the cellular telephone numbers they use are listed in a different individual's name or they will frequently change phone numbers. Drug distributors will often "drop" or switch

cellular phones to avoid detection by law enforcement. This will result in the accumulation of several different cellular phones.

40. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how electronic devices works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely

reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how devices were used, the purpose of their use, who used them, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41. *Nature of examination.* Based on the foregoing, and consistent with Rule 41, the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

42. *Manner of execution.* Because this warrant seeks only permission to examine Devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is probable cause for the Court to authorize execution of the warrant at any time in the day or night.

43. *Methods of examination.* In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the crime(s) under investigation, including but not limited to undertaking a cursory

20

inspection of all information within the Devices. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular Devices data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in a cellular device's data that are relevant to an investigation do not contain any searched keywords.

## Conclusion

44. Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

45. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Cody Norman
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to by phone on September __18__, 2025.

Christine D. Little
UNITED STATES MAGISTRATE JUDGE

22

## ATTACHMENT A

### Property to be Searched

The property to be searched are cell phones identified as: **Samsung Galaxy smartphone with Sunflower Case,** identified in Attachment A(1); **a blue Max West Nitro N62 smartphone**, identified in Attachment A(2); **a Motorola XT2513-2 cell phone**, identified in Attachment A(3); **a blue Moto G Play cell phone**, identified in Attachment A(4), hereinafter the "Devices." The Devices are currently located at 129 5th Ave NW, Miami, Oklahoma 74354.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## Attachment A(1)

### Samsung Galaxy Smartphone with Sunflower Case

Belonging to Natasha Beaty





## Attachment A(2)

### Blue Maxwest Nitro N62 Smartphone

Belonging to Betty McCollum





## Attachment A(3)

### Motorola XT2513-2 Cell Phone

Belonging to Betty McCollum





## Attachment A(4)

### Blue Moto G Play Smartphone

Belonging to Jeremiah Kruschick



## ATTACHMENT B

### Particular Things to be Seized

All records on the Devices described in Attachment A that relate to the unlawful drug possession and drug distribution in violation of Title 21, United States Code, Section 841, including:

1. Records relating to communication with others as to the criminal offense(s) listed above; including incoming and outgoing voice messages; text messages; emails; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

2. Records relating to documentation or memorialization of the criminal offense(s) listed above, including voice memos, photographs, videos, and other audio and video media, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos, including device information, geotagging information, and information about the creation date of the audio and video media;

3. Records relating to the planning and execution of the criminal offense(s) above, including Internet activity, firewall logs, caches, browser history, and

6

cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

4. Application data relating to the criminal offense(s) above;

5. Lists of customers and related identifying information related to the criminal offense above;

6. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions related to the criminal offense above;

7. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information) related to the criminal offense above; and

8. All bank records, checks, credit card bills, account information, and other financial records. Records relating to financial data, to include bank records, checks, credit card bills, account information, and other financial records, electronically stored records showing proof of residence, proof of storage unit use and/or rentals, additional properties owned or documents reflecting stash houses, real estate transaction documents, rental agreements or documents, as well as automotive sale or purchase or financing documents, electronically stored documents purporting to indicate income or salaries received reflecting employment, hours worked, wages earned, withholdings, W-2 and W-4 forms,

7

(blank or executed), state and federal tax returns or documents pertaining to the preparation thereof, electronically stored records showing secret clientele lists, business associates, and diversification of wealth, United States Currency, any other electronically stored tangible items evidencing the obtaining, transfer, secreting, and/or concealment of assets and/or money, electronically stored records, documents, receipts, and/or negotiable instruments which evidence the purchase of negotiable instruments and/or the structuring of currency transactions to avoid the filing of currency transactions reports and/or the laundering of monetary instruments, electronically stored documents evidencing fruits, instrumentalities, monies, records, and notations, associated with the crime(s) listed above.

9. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

10. All records and information related to the geolocation of the Devices on July 3, 2025;

11. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

9